So let's turn to the next case on the calendar, which I believe is United States v. Cooney. And do we have both counsel ready? Do we have Ms. Notari? Yes, Your Honor. And do we have, let's see, Attorney Nakei? And I'd like you to tell me if I'm pronounced, how should I pronounce your name? I don't want to get it wrong. Thank you, Your Honor. Good morning. It's Nagar Teke on behalf of the United States. Teke. Thank you very much. So, Ms. Notari, I understand you've reserved two minutes for rebuttal. So if you'd like to proceed. Your Honor, just one moment. I don't see my video. Do you see my video? No, not yet. We'll wait for you to get on video. I'm trying to... The game clock is paused while you're getting your video. Don't worry. I'm not sure why it's not clicking. My experience is that sometimes you have to reboot the whole computer in order to effectuate this. You're not on some sort of remote visual, remote platform, are you? Apart from just the computer itself? I'm not... We did see you just a second ago. What I will say is that we're also perfectly prepared to hear your argument even without the video. Okay, so we could do that. I'm fine with that. Why don't we proceed that way? I think that we'll be able to work just fine. We often do this by telephone conference call, and I think we have no problem understanding arguments. So can you see us and can you see the timer? Yes, I can. Okay. Why don't we go forward and try it that way? Okay. Your Honor, may it please the Court, Your Honors, good morning. My name is Paula Nantelli, and I represent Defendant Appellants Bevin Cooney. Your Honors, we are challenging that the record below does not support a finding with sufficient clarity for appellate review regarding the restitution in this case, which was the standard is very clear that both the Mandatory Victims Restitution Act and the loss guidelines, which apply with the same effect, the requirements under Chapter 2, just like the MVRA, requires that there must be a sufficient causal relationship between the defendant's fraudulent conduct and the loss to the victims. There must be a proximate causation, which not only shows that the defendant's fraudulent conduct caused the victim's loss, but also in the case of, in this case, the co-conspirators, that their actions were reasonably foreseeable to the defendants in this case. This case was incredibly complex. It was a six weeks trial. And what further makes the complexities here in the Court's finding is that the judge, Judge Cooney and Co-Defendant Archer's conduct, the reason why this is complex is because essentially Mr. Cooney and Mr. Archer's conduct as charged in the indictment regarding counts 1 and 2 were essentially the same conduct. They purchased the same charge. I'm going to jump in. I think the two minute limit is a rough one. Okay. My question, Judge Abrams ruled in Archer's favor post-verdict, but expressly did not rule in Cooney's favor post-verdict. And her decision in Archer was reversed by the Second Circuit. So I don't understand these arguments. I mean, it was a complex case. It was a lengthy trial. But Mr. Cooney's involvement was right from the get-go when they were looking for money through these various tranches of sales of the bond that were made. And, you know, he was in with Galanis, Jason Galanis. And it seems to me that he was, it's not like he joined this conspiracy late in the process. He was there from the beginning. And therefore, it seems to me that the full restitution of the 43 million is appropriate under those circumstances. Your Honor, I'm glad you bring up the timing because respectfully, the problem with the court's record is the court was very undecided in many of these issues, specifically including when Mr. Cooney joined the conspiracy. If you review both her opinion in the Rule 33 as it applies to Mr. Cooney and also if you review her opinion at the sentencing hearing, she specifically says that she's not certain as to when Mr. Cooney joined the conspiracy because she specifically found that Mr. Cooney and Mr. Archer's purchase of the second tranche of bonds alone was not dispositive evidence of Mr. Cooney's tranche. The first tranche was the 28 million. And the 28 million was, Cooney was there. He was talking about, they were talking about discretionary liquidity, a honey trail, excess honey. And then he made the comment about, you know, the West Coast charging down the field when Hughes would take the bond. So, you know, it seems to me, I don't see how you can argue that he wasn't involved all the way through. There was a difference between Archer and Cooney in one sense, and that is that Archer, the case against Archer depended on circumstantial evidence primarily, and he wasn't involved in all the conversations with Jason Galanis. But you're not arguing here, anywhere, that there was insufficient evidence against Cooney here. You're just arguing that we'll accept all the evidence against Cooney, but somehow he's not responsible for restitution. I just don't follow it. I mean, I just, I do follow a part of it. Obviously, the government concedes certain parts, that some of the restitution order needs to be adjusted. But Your Honor, first, I would note that the email communications that you're relying upon, specifically Judge Abrams' call, that she agreed that those communications, essentially in their entirety, were socially innocuous, or she said, were at best, most naturally subject to innocent interpretations. She even cited, in her opinion, exonerating Archer, an email by Cooney indicating that he did not know the purpose of, you know, what the monies were going towards. And this was what she relied upon, exonerating. So she went through all of those discretionary liquidity emails. She went through every single one of them. There was not one email, which she felt was dispositive evidence of guilt. She specifically held that that evidence was innocuous. And she went on, and the reason why, you know, it's- But in the end, she concluded that together, the evidence was So I'm not sure why we would take evidence piece by piece, as opposed to review the district court's ultimate conclusion. So what I think, what I'm asking the court to do, respectfully, is the court, Judge Abrams specifically, in the end, she focused on three categories of evidence, which she felt was evidence of Mr. Cooney's, that convinced her that there was sufficient evidence of his fraudulent conduct. And if you look at those three categories, which she very specifically defined, those categories had to do with, one, his receipt of monies from the WAPC account. Two, his submission of what she considered a backdated form to the SEC, referencing a fake entity known as Calvert. And three, his purported lies to City National Bank involving a loan he received. If you look at those three categories, those three categories are not- This was all other act evidence. This was 404B evidence that was admitted. And none of these acts, which connect to Mr. Cooney, are connected to the victims in this case. The victims, there was two- The defense's position is that there were two conspiracies. The only counts relating to Mr. Cooney were counts- The counts where he purchased the second tranche of bonds with the WLC State. He was not involved in 3 and 4. He was not- There was clear evidence that he had nothing to do with the victims. He never met the victims. He never- He had no board position. He was a passive investor. And if you simply isolate the conduct, there's no causal connection between his conduct and the loss that were suffered by the victims. For example, the fact that he lied to his bank to get a loan in January of 2015 has zero to do with the victims in this case. There's no way that you can say, by lying to a bank to get a loan, that somehow that conduct resulted in either actual or intended loss, that it was reasonably foreseeable for him to lie to his bank to believe that somehow that lie to a bank on a loan caused losses to the funds here, these Atlantic investors. So if you- Counsel, you've reserved two minutes for rebuttal. If you'd like, you may use some of that time now, or if you prefer, you could reserve it. Thank you. I would love to reserve it. Thank you very much. Let's hear from the government. May it please the court. My name is Negar Tekie, and I'm an assistant United States attorney here in the Southern District of New York. I represent the United States on this appeal, and I also represented the United States in the proceedings below. The defendant, Bevan Cooney, participated in a scheme to defraud two sets of victims, as Judge Walker has already noted this morning. First, he victimized the WAC POMNY by inducing it to issue $60 million worth of tribal bonds, the proceeds of which he and his co-conspirators used, not for an annuity that they had promised the WAC POMNY would fund economic development projects, but for their own personal use and to help build a financial services conglomerate that they would control and that they hoped to sell for profit. Second, he victimized 10 pension funds, all of which were clients of asset managers that Cooney and his co-conspirators acquired by investing their money in WAC POMNY bonds, and then, among other fraudulent actions, misappropriating client money for their own purposes. After a six-week trial, a jury found fraud and securities fraud. Cooney does not challenge that conviction here. At sentencing, after having presided over the trial, having made specific post-trial findings that Cooney was a willful participant in the scheme, having reviewed the pre-sentence investigation report and victim impact statements, and having made specific findings with respect to the loss amount and thorough sentencing proceeding, the district court was well within her discretion to hold that Cooney or the reasonably foreseeable acts of his co-conspirators victimized WAC POMNY and 10 pension funds and was well within her discretion to hold him liable for restitution to all of the victims. As the district court held in post-trial rulings and at sentencing, quote, ample evidence, end quote, demonstrated that Cooney was a willful participant in the scheme. That evidence, including what Judge Walker has already outlined this morning, included the following. Cooney's receipt of $5 million in misappropriated bond proceeds that had been taken from investment advisor clients, the pension fund victims in this case, which Cooney used to purchase $5 million worth of additional WAC POMNY bonds, making WAC POMNY believe that there was, in fact, a market for the sale of these bonds when there wasn't. Cooney's receipt of $3.895 million directly from the fake annuity provider, followed by his false statements to his accountant about the source of those funds. Cooney's receipt of an additional $75,000 directly from the fake annuity provider's comprising funds misappropriated from another pension fund victim and Cooney's use of fake backdated documents to conceal his receipt and misuse of bond proceeds funneled through the fake annuity provider account. In holding Cooney liable for restitution to the pension fund victims, the district court specifically held that the government had established that Cooney knew the pension fund's money had been misappropriated and that the restitution order should therefore encompass these loss amounts. Can I ask you to direct your attention to the concession in your brief regarding what you recommend to be the adjustment that we should make to the restitution order with respect to the WACPOMNY? Yes. Could you just explain, I assume that that's simply an error that the government noticed in the course of preparing its brief? Yes, Your Honor. It was not, Mr. Cooney did not object to that specific amount at sentencing in preparing our brief and reviewing the victim entered against Cooney's co-defendants in this case. We realized that a portion of the WACPOMNY victim impact statement included funds that were expectation damages. In other words, not money that WACPOMNY had incurred as losses already in connection with the scheme. And therefore, as we concede in our brief, and the court has the power to modify the restitution order in this regard, WACPOMNY, the amount owed to WACPOMNY should be $150,000. Can I ask you, I suppose, as a technical procedural question, your brief suggests that we exercise our authority to modify the restitution judgment ourselves. Is there some procedural advantage or disadvantage to our doing it ourselves as opposed to vacating the regard and directing that the district court enter a modified judgment upon the record? Your Honor, because the court is empowered to do so, and rather than create additional, additional, for lack of a better term, work for the district court to amend the order, since the court is empowered to do so, then that's why we asked this court to modify the restitution order as part of its judgment on appeal. I'm sorry, Judge Walker. No, go ahead. Well, if we do that, how does it get on the district court docket? What does the docket entry look like on the district court? Because people will look for that and want to see what the judgment is. And it's got to be amended on the district court docket somehow. Now, I assume that our order would somehow be communicated and entered in the district court docket. Is that accurate? I think that's accurate, Your Honor. And I'm going to mispronounce it. The case that's cited in our brief, this court simply modified the award to reduce it to the amount that the defendant had pointed out to reduce the amount that the defendant in that case had pointed to as the amount in error. Sitting here today, I'm not exactly sure how that was reflected on the docket of that case. I suppose what we could do is, as part of our order, direct that the district court make appropriate adjustments to its docket to reflect this development. That's certainly the case, Your Honor. It really sticks to one half dozen of the others, whether we send it back or do it ourselves. Can I also ask, and maybe this is going to be a question for the next case, whether the government is making a similar concession in Golanus, and what are you planning to do with all of the other co-defendants whose judgments, I presume, have become final, and I don't know that there are appeals pending in those other ones. But I assume that this is an issue that would apply across the board to all the defendants. Maybe some of them are out a lot. Maybe their judgments are final, and maybe it's a moot point, given the vast dollar amounts involved in restitution. But I worry that if some of these defendants are paying installment payments over time, and the clerk's office is called upon to distribute them pro rata, that the pro rata payments might be, the percentages might be off if they're not adjusted. So does the government have a plan, or what's the thinking there? Yes, Your Honor. To the extent that a defendant raises an objection through whatever mechanisms are available to that defendant currently, we will handle it at that point. I'll note for the court that some of the defendants, in particular Jason Golanus, whose restitution order was first resentenced, did not object to the amount that the WAPOMNY had stated in their victim impact statements, nor did other of the defendants in this case, including John Golanus, whose case is up next before the court. However, and I'll also note that as a practical matter, oftentimes defendants say when they are able to pay back restitution, and in this case, that's not clear that any of the defendants will be able to, to your point that it may be moot or academic, when they are able to pay back restitution, the government sometimes settles with those defendants for a particular amount that is then distributed to the victims. And so while there is no ready mechanism necessarily available in each case, we will certainly hear each defendant to the extent that they raise objections, or that they want to raise the issue with the government and work to ameliorate any issues. Well, and again, maybe this isn't the question for you, but I'm sure your co-counsel in John Golanus is listening. I will be interested to know, considering that the government raised this issue, so a spontane, to its credit, even though it had been forfeited by not being raised by the defense in CUNY, I'm wondering whether the government is taking the same approach in John Golanus, considering it wasn't raised there either, but here we are on appeal. Your Honor, we are. In fact, we reached out to counsel for Mr. Golanus and my colleague, Ms. Mermelstein, can speak to this, but we reached out to counsel for Mr. Golanus, asked him if it is something he intends to raise today. I expect that he will have an answer to that question, but to the court's point, yes, it is an issue that we identified and we've taken a step to discuss that issue with counsel for Mr. Golanus as well. Wouldn't it be quite simple to have a stipulation with defense counsel that are affected by this, that could be affected by this, and take it back to Judge Abrams and have her just enter it, that the restitution order is reduced by $357,000 with respect to the WACPOMI? Thank you, Your Honor. That does seem like a potential avenue for solving this or resolving this issue. Just put the whole thing up at one time with one fell swoop. Yes, Your Honor, we will certainly consider doing that. Okay. Counsel, thank you very much. I think now we will turn back to Ms. Notari. Ms. Notari, you have reserved two minutes, I believe. Yes, Your Honors. I just briefly want to cite a couple of points that the federal government is citing is evidence of this scheme, but Judge Abrams was very specific to rule that the mere purchase of the bonds and the fact that Cooney and Archer knew that the object of this conspiracy, they had no reason to know at the time they purchased, that their purchase or any of the surrounding evidence would have given them reason to know that this was a criminal object and that this was clearly a legal bond. There were the lawyers for the bond who testified that many of the actions which the government is citing to were found to be innocuous. They were found to be not criminal conduct. So I encourage, Your Honor, to review the three categories of evidence that Judge Abrams focused on and to consider that evidence and whether there is a proper finding that this evidence was approximately the cause or reasonably foreseeable to Mr. Cooney as far as the victims and his conduct. I submit that it doesn't meet this threshold. And I further encourage, Your Honors, to focus on the record and the fact that the district court was very undecided and contradictory as far as making statements as to when Mr. Cooney joined the conspiracy. In fact, she went on to conclude that there was a loss analysis which envisions Mr. Cooney joining the conspiracy later, and she found that in that event, the loss would not account for the $27 million, and the loss would not account for the 10 victims, and that the loss would be much less. Counselor, he knew that the $27 million was not going into an annuity for the tribe, right? Quite clearly. Because he purchased $5 million of that in the second offering, and that money was, you know, he purchased those bonds knowing that they were still part of it. It wasn't going back into the, it wasn't benefiting the Wakpami in any way. And the jury found all of this. You know, it's hard to, you know, you're cherry-picking little pieces of evidence and asking us to look at those when, in fact, there was an overall scheme and the jury reached a verdict on your client's guilt. Your Honor, respectfully, there was testimony throughout the trial that he, not only did he know that Jason Galanis had misappropriated the money that he stole from the asset funds, the cooperator, in fact, who testified agreed that they didn't know that he was misappropriating the money. Mr. Kiyokuni had no access to those accounts. He was just a person who was a passive investor. He had no insight. He had no access to any of the funds that Jason Galanis stole from. Jason Galanis compartmentalized his conduct to such an extent that no one had a view to what he was doing. The only people who were able to see that were, much later, the cooperators admitted that they were able to see that he had done that. But clearly, Devin Archer bought the second tranche of bonds, and his conduct was exactly the same as Mr. Kiyokuni. And Judge Abrams found, she exonerated him. So there's nothing that Mr. Kiyokuni did with respect to the purchase of the bonds, which was different than what Devin Archer did. And somehow, he was exonerated, and Mr. Kiyokuni was convicted based on these later acts, which showed some consciousness of knowledge. But that standard, which Judge Abrams relied upon, is not sufficient to show a causal connection between his acts and the loss to the victims. And what I'm asking for your honors is really just to remand this for more specific findings by Judge Abrams to actually make a better record, and that there could be clarity in what she meant, what her findings were. Okay. Well, thank you very much, counsel. We appreciate both of your arguments. We will take that under advisement.